# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

№ 13-cv-3789 (JFB)(WDW)

————————————

## DIANA A. KNOX AND PHILIP L. KNOX, JR.,

Plaintiffs,

VERSUS

## COUNTRYWIDE BANK, BANK OF AMERICA, OCWENS LOAN SERVICING, LLC, FEDERAL NATIONAL MORTGAGE ASSOCIATION, MERSCORP HOLDINGS, INC., MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,

Defendants.

————————————

**MEMORANDUM AND ORDER**
March 12, 2014

————————————

JOSEPH F. BIANCO, District Judge:

Defendants move to dismiss this action alleging fraud and other claims related to plaintiffs' mortgage agreements with defendant Countrywide.[1]  Plaintiffs are individual homeowners who mortgaged their home to Countrywide in 2004, and then sought a second mortgage in 2008.  The two mortgages were combined in a "Consolidation, Extension, and Modification Agreement" ("CEMA") that plaintiffs contend was fraudulent, both because Countrywide allegedly inserted false financial information into the application, and because Countrywide allegedly concealed that the underlying note was invalid.

For the reasons discussed herein, the Court grants defendants' motion in part and denies it in part.  The complaint's core assertions of fraud are dismissed because plaintiffs acknowledge that they knew their loan documents contained false financial information, but signed them anyway.  To the extent that the fraud claims are based on the alleged invalidity of the 2004 mortgage note, plaintiffs' legal theory concerning the splitting of the note from the mortgage does not comply with New York law.  The remaining claims are time-barred, fail to allege sufficient facts, or are not cognizable as affirmative claims for relief, except plaintiffs' quiet title claim, which may proceed.  Leave to amend the other claims would be futile, and is denied.

---

[1] Defendant Countrywide was purchased by Bank of America, but the Court will refer to it as "Countrywide" throughout this Memorandum and Order.

## I. BACKGROUND

### A. Procedural History

Plaintiffs filed this suit on June 7, 2013, in the Supreme Court of the State of New York, Nassau County.  Defendants timely removed the case to this Court on July 8, 2013, on the basis of diversity jurisdiction.  On July 15, 2013, defendants moved to dismiss.  On September 3, 2013, plaintiffs filed a brief in opposition to the motion to dismiss, and also filed a motion to remand.  Defendants opposed the remand motion and replied in support of their motion to dismiss on October 3, 2013.[2]

### B. Factual Background

The following facts are taken from the complaint.  The Court assumes these facts to be true for the purpose of deciding this motion, and construes them in the light most favorable to plaintiffs, the non-moving party.

Plaintiffs are the deeded owners of a home in Oyster Bay, New York.  (Compl. ¶ 1.)  On April 23, 2004, plaintiffs mortgaged their home to Countrywide, a transaction with an original principal balance of $329,000.00.  (*Id.* ¶ 5.)  In January 2008, plaintiffs experienced severe credit card debt and were concerned that they might face bankruptcy and foreclosure.  (*Id.*)  Plaintiffs contacted several lenders to obtain a home

equity loan, but were unsuccessful until they approached Countrywide.  (*Id.* ¶¶ 4-7.)  Based on plaintiffs' respective credit scores, Countrywide agreed to make a loan to Diana Knox only.  (*Id.* ¶ 7.)  Plaintiffs informed Countrywide of their desire to close on the loan before Diana was scheduled to leave the country on February 15, 2008.  (*Id.* ¶ 8.)

On February 12, 2008, a Countrywide official sent Philip Knox paperwork for Diana to sign, and said that if she signed and returned it right away, the closing could occur that same evening.  (*Id.* ¶ 9.)  The paperwork included a loan application, which already contained data stating Diana's income as $9,000.00 per month, and stating that she had $18,515.01 in a 401k plan.  (*Id.* ¶¶ 10-11.)  The complaint states that these figures were inaccurate, and that on February 12, 2008, Diana's income was actually $2,130.00 per month, with no money invested in a 401k.  (*Id.* ¶ 12.)  Philip informed Countrywide of the inaccurate data, but was allegedly told that the application needed to remain as received.  (*Id.* ¶ 13.)  Countrywide also told Philip that, in order to close on the loan that evening, he should sign the application in Diana's name, since Diana would not return home from work until the afternoon.  (*Id.*)

Philip then signed the loan application on his wife's behalf, and plaintiffs closed on the loan that evening.  (*Id.* ¶¶ 14-15.)  At the closing, Diana received additional paperwork containing false income data, but signed it nonetheless.  (*Id.* ¶ 18(c).)  The result of the closing was that the 2004 mortgage and note were consolidated with the second, 2008 mortgage and note, in the form of a new loan with a value of $585,000.00, as reflected in the "Consolidation, Extension, and Modification Agreement" ("CEMA").  (*Id.* ¶ 15; Def. Mot. at 2.)

---

[2] Plaintiffs alleged in their complaint that they are New York residents, and that each defendant's principal place of business is outside of New York.  (Compl. ¶¶ 1-2.)  They also sought damages of $309,941.22.  (*Id.* at p.27.)  The remand motion does not cast doubt on either of these allegations, but instead simply lists individual places of business in New York which are controlled by defendants, and cites a legal test related to federal-question removal.  Thus, the Court has subject matter jurisdiction based on diversity of citizenship, and the motion to remand is denied.

### C.  Legal Background

These plaintiffs are not the first to allege that the splitting of a mortgage from its note invalidates those instruments. Similar claims have been made in many cases involving defendant Mortgage Electronic Registration Systems ("MERS"). In this case, plaintiffs allege that the 2004 note was split from the mortgage when the latter was assigned to MERS, thereby invalidating both instruments and making their consolidation into the CEMA an act of fraud by Countrywide.

Although the complaint is not particularly clear concerning how the 2004 mortgage and note were split, the note shows that while Countrywide held the note, MERS was the mortgagee of record. (Ex. B to Compl.) The complaint alleges that, in consolidating the 2004 mortgage and note into the CEMA, Countrywide was attempting to "bury" instruments it knew to be defective.[3] (Compl. ¶ 31.)

In recent years, MERS has faced similar arguments in litigation around the country. The New York Court of Appeals has provided useful background information concerning the history and operation of MERS:

> In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages. Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers

of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.

> The initial MERS mortgage is recorded in the County Clerk's office with "Mortgage Electronic Registration Systems, Inc." named as the lender's nominee or mortgagee of record on the instrument. During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system. In the MERS system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act, but not necessarily of assignments of the beneficial interest in the mortgage.

*Matter of MERSCORP, Inc. v. Romaine*, 8 N.Y.3d 90, 96 (2006) (footnotes omitted).

Often, as in this case, MERS holds the mortgage interest as the mortgagee of record while the original lender, or some other entity, holds the underlying note. Homeowners have argued that this practice of "splitting" the mortgage from the note renders one or both invalid. *See In re Mortgage Electronic Registration Sys. (MERS) Litig.*, MDL Docket No. 09-2119-JAT, 2011 WL 4550189, at *3 (J.P.M.L. Oct. 3, 2011); Brett J. Natarelli & James M. Golden, *The End of the Beginning in the Battle Over MERS*, 65 CONSUMER FIN. L.Q. REP. 400, 401-02 (2011). In general, courts have upheld the MERS system against broad

---

[3] To the extent that plaintiffs separately allege Countrywide's loss of ownership of the 2004 note, that allegation is discussed as part of plaintiffs' first fraud theory, *infra* section III.B.

challenges, *id.*, although the Second Department in New York has held that the splitting of the note from the mortgage affects which entities have standing to foreclose. *Bank of New York v. Silverberg*, 926 N.Y.S.2d 532 (N.Y. App. Div. 2011). That case is central to plaintiffs' theories of liability, and is discussed in more detail below.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth two important considerations for courts deciding a motion to dismiss. 556 U.S. 662 (2009). The Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly*, 550 U.S. at 556-57 (internal citation omitted)).

However, where a case concerns allegations of fraud or mistake under Rule 9(b) of the Federal Rules of Civil Procedure, claims must be pled with particularity. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Generally, to comply with Rule 9(b)'s specificity requirements, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)) (internal quotation mark omitted). Conclusory allegations of fraud will not survive Rule 9(b)'s heightened pleading standard, and therefore, will be subject to dismissal at the motion to dismiss stage. *See Nasso v. Bio Reference Labs, Inc.*, 892 F. Supp. 2d 439, 446 (E.D.N.Y. 2012) (citing *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444 (2d Cir. 1971)).

Where a motion to dismiss presents itself before the court, a court may examine the following: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or

possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Nasso*, 892 F. Supp. 2d at 446 (internal quotation marks and citation omitted). As is discussed below, plaintiffs attached numerous documents to the complaint which the Court can consider, and has considered, in connection with the motion to dismiss.

Plaintiffs in this case are proceeding *pro se*, and courts are obliged to construe the pleadings of a *pro se* plaintiff liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008); *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). *Pro se* complaints should be read to raise the strongest arguments they suggest, *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam), but a complaint must nonetheless "'state a claim to relief that is plausible on its face.'" *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (citing *Iqbal*, 129 S.Ct. at 1949); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (applying *Twombly* and *Iqbal* to *pro se* complaint).

### III. DISCUSSION

The following discussion first considers plaintiffs' argument that the splitting of the 2004 mortgage and note invalidated those instruments, and then turns to plaintiffs' claims of fraud, deceptive practices, and other statutory and common law theories of liability.

### A. The Mortgage-Splitting Argument

As discussed above, homeowners around the country have argued that the MERS practice of separating mortgages from their underlying notes invalidates those instruments. Many of these challenges have failed, but in *Bank of New York v. Silverberg*, the Second Department held that there was no standing to foreclose where the bank held a mortgage interest assigned to it by MERS, but not the underlying note. 926 N.Y.S.2d 532 (N.Y. App. Div. 2011). Like this case, *Silverberg* involved a Consolidation Agreement in which Countrywide was the original lender and MERS was named as Countrywide's nominee and the mortgagee of record. *Id.* at 534. MERS assigned the mortgage interest to the Bank of New York, who attempted to foreclose. *Id.* The case was dismissed because, under New York law, mortgages pass as incidents to their underlying notes, and "a transfer of the mortgage without the debt is a nullity, and no interest is acquired by it." *Id.* at 537 (quoting *Merritt v. Bartholick*, 36 N.Y. 44, 45 (1867)).

Plaintiffs rely on the preceding quote in several places in their submissions to this Court, but in doing so, they have missed part of the broader rule quoted in *Merritt* and still followed in New York today. Stated completely, the "principal-incident rule" is as follows:

> [T]he incident shall pass by the grant of the principal, but not the principal by the grant of the incident.

*Id.* In other words, while a mortgage (the incident) is unenforceable apart from its note (the principal), the note is nonetheless enforceable apart from its mortgage.

*Silverberg* did not change the principal-incident rule. As one court has since explained, even after *Silverberg*, "the focus, under the 'principal-incident' rule, should be on the mortgage note and not, as in various cases, upon the mortgage as a security instrument." *Deutsche Bank Nat'l Trust Co. v. Pietranico*, 928 N.Y.S.2d 818, 833 (N.Y. Sup. Ct. 2011). That court explained that under New York law, including *Silverberg*:

> Any disparity between the holder of the note and the mortgagee of record does not stand as a bar to a foreclosure action because the mortgage is not the dispositive document of title as to the mortgage loan. The holder of the note is deemed the owner of the underlying mortgage loan with standing to foreclose.

*Id.* at 830; *Silverberg*, 926 N.Y.S.2d at 539 (distinguishing a case where MERS had standing to foreclose because the lender had transferred the promissory note to MERS); *see also In re Escobar*, 457 B.R. 229, 239-40 (E.D.N.Y. 2011) ("*Silverberg* followed a long, long line of New York cases which held or stated that, as a general matter, once a promissory note is tendered to and accepted by an assignee, the mortgage passes as an incident to the note . . . . Similarly, New York has long recognized that assignment of the mortgage carries with it no rights to enforce the debt.").

In short, *Silverberg* was a case about standing, holding that an entity with a mortgage but no note lacked standing to foreclose. Although *Silverberg* provided support to mortgagors defending a foreclosure, it did not provide a windfall to all mortgagors who transacted with MERS.

## B. Plaintiffs' First Fraud Theory

The foregoing discussion demonstrates the flaw in plaintiffs' primary theory of fraud, which rests on their legal conclusion that Countrywide was not the "holder in due course" of the 2004 note because it was split from the mortgage. Of course, a legal conclusion of this nature is not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 679-80. There appear to be two factual elements to plaintiffs' theory that the Court accepts as true for the purposes of this motion. First, plaintiffs allege that the mortgage was split from the note, with Countrywide holding the note and MERS, or its assignee, holding the mortgage. As a matter of law, however, that fact does not extinguish plaintiffs' debt—at most, after *Silverberg*, the split could affect a mortgage-holder's standing in a foreclosure case, which this is not. Thus "[i]t is the interest in the note that is controlling and it is irrelevant if a nominee for the beneficial owner of the note is listed as the mortgagee of record." *Pietranico*, 928 N.Y.S.2d at 833.

Plaintiffs also appear to allege, as a factual matter, that Countrywide lost ownership of the 2004 note at some point. This allegation refers directly to a printout from the MERS website, and attached to the complaint, stating that Fannie Mae was the "investor" in the 2004 note. (Ex. E to Compl.) Even viewed in a light most favorable to plaintiffs, this allegation is insufficient by itself to plausibly state a fraud claim. The printout is dated February 9, 2011, and thus even if the Court assumed, in an abundance of caution, that Fannie Mae's status as "investor" meant that Countrywide no longer held the 2004 note, its lack of ownership of the note in February of 2011 is not a sufficient allegation to state a claim that Countrywide committed fraud in 2008. The MERS printout does not state,

nor does the complaint allege, anything concerning who held the note when Countrywide executed the CEMA.

Moreover, plaintiffs attached the relevant documents to the complaint, and the 2004 note itself lists Countrywide as the "Lender" to whom plaintiffs would make payments. (Ex. B to Compl.). The 2004 note was an exhibit to the 2008 CEMA, in which Countrywide was also the "Lender" and "Note Holder." (Ex. D. to Compl.) Exhibit A to the CEMA lists the 2004 note as part of the consolidation, shows that both documents were recorded with the Nassau County clerk, and reflects the balance owed to Countrywide on the 2004 note. (*Id.*) Thus, on the face of the relevant documents, Countrywide held the 2004 note when it executed the CEMA, and the complaint does not allege facts to suggest otherwise, much less the particular facts required by Rule 9(b). Accordingly, plaintiffs' first theory of fraud does not state a claim, and is dismissed.[4]

### C. Plaintiffs' Second Fraud Theory

Plaintiffs' second theory of fraud alleges that Countrywide wrote false financial information into their application for the 2008 mortgage, and instructed plaintiffs to sign the application even after plaintiffs told Countrywide that the information was false. Though both plaintiffs[5] admit signing the

application and related loan documents despite knowing that the income data was false, the complaint states that they did so "[d]ue to the severe financial stress that the Plaintiffs faced . . . [and] the reality that they could not get a loan from any other financial institution." (Compl. ¶ 14.)

Plaintiffs' financial situation does not convert their knowing submission of false information into a cause of action for fraud against Countrywide. "Under New York law, the elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d Cir. 1987)).

Assuming in a light most favorable to plaintiffs that the complaint alleges a material false representation, and even assuming that Countrywide's conduct exhibits an intent to defraud, the complaint does not allege facts showing reasonable reliance. It is unreasonable to rely on a lender's misstatement of one's own income, which one knows to be false.[6] *See*

---

[4] Plaintiffs allege, as evidence of fraud, that a Countrywide official improperly certified the CEMA for MERS, and that the agreement was witnessed by an unlicensed notary. Plaintiffs lack standing to enforce any MERS regulation against Countrywide, and even if there is a factual dispute concerning the validity of the notarization, that fact is not sufficient on its own to state a claim of fraud.

[5] The complaint alleges that, although Philip Knox was first to receive and sign paperwork containing false income data, Diana did the same at the closing. (Compl. ¶ 18.)

[6] Defendants have relied on a similar proposition to argue that plaintiffs waived the fraud claim or ratified the CEMA by accepting benefits under it with knowledge that it was obtained with false information. The Court concludes that plaintiffs' knowledge of the false data is more properly analyzed as demonstrating the unreasonableness of their reliance, since finding waiver or ratification based upon these same facts would suggest that there was a viable, but subsequently extinguished, fraud claim. Furthermore, ratification cases in the real estate context often involve mortgagors who have made payments on the mortgages, *see, e.g.*, *Moweta v. Citywide Home Improvements of Queens, Inc.*, 700 N.Y.S.2d 845 (N.Y. App. Div. 1999), and it is unclear whether plaintiffs made any payments after executing the CEMA. Therefore, the Court does not

*Hayrioglu v. Granite Capital Funding, LLC*, 794 F. Supp. 2d 405, 413 (E.D.N.Y. 2011) ("[I]t would certainly not have been reasonable for the plaintiff to rely on Metropolitan National's claim that his monthly income was approximately $7,000 more than he believed it to be."); *see generally DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (2010) (quoting *Schumaker v. Mather*, 133 N.Y. 590, 596 (1892) for the rule that "if the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations," and noting that the rule "serves to rid the courts of cases in which the claim of reliance is likely to be hypocritical"). Because plaintiffs could not have reasonably relied on information they knew to be false, they have not stated a claim for fraud.

To the extent that plaintiffs' second fraud claim seeks damages, it is also barred by the doctrine of *in pari delicto*. "The *in pari delicto* defense prohibits suits in which the plaintiff is as or more culpable than the defendant in the conduct forming the basis for the complaint." *UCAR Int'l, Inc. v. Union Carbide Corp.*, 119 F. App'x 300, 301-02 (2d Cir. 2004). Though the culpability must be similar, "the law does not require [the parties'] wrongdoing to be of an identical nature for the *in pari delicto* defense to apply." *Id.* at 302. The Court of Appeals recently reaffirmed the importance of the *in pari delicto* defense:

This principle has been wrought in the inmost texture of our common law for at least two centuries. . . . The doctrine survives because it serves important public policy purposes. First, denying judicial relief to an admitted wrongdoer deters illegality. Second, in pari delicto avoids entangling courts in disputes between wrongdoers. . . . [T]he principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be weakened by exceptions.

*Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) (internal quotation marks and citations omitted).

Here, plaintiffs are "admitted wrongdoer[s]"—they admit in their complaint that they signed a mortgage application which they knew contained false financial information. Though plaintiffs allege that Countrywide pressured them, even in a light most favorable to plaintiffs, Countrywide's statement was that they should sign the paperwork "if the Plaintiffs wanted to close on the loan that evening." (Compl. ¶ 13.) It was the plaintiffs who had insisted on an expedited closing schedule because of Diana's trip abroad (*id.* ¶ 8), and they chose the immediacy of the loan over the accuracy of the application. Thus, they are at least as culpable as Countrywide, and their fraud claim must be dismissed. *See Donovan v. Rothman*, 756 N.Y.S.2d 514, 515 (N.Y. App. Div. 2003) (affirming dismissal where "[p]laintiffs were signatories to the allegedly illegal agreement"); *cf. UCAR*, 119 F. App'x at 302 (noting that *in pari delicto* does not apply where a plaintiff is forced to act through

---

conclude that plaintiffs ratified the CEMA, and finds it unnecessary to take judicial notice of plaintiffs' bankruptcy filings, as requested by defendants.

"domination and control" but finding none where plaintiff admitted engaging in willful behavior).

## D.  GBL § 349

Plaintiffs also allege that Countrywide engaged in deceptive business practices in violation of GBL § 349, but claims under that section are subject to a three-year statute of limitations. *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 210 (2001). The allegations of deceptive conduct, like the allegations of fraud, relate to the execution of the CEMA in February of 2008. Plaintiffs filed this lawsuit on June 7, 2013, and accordingly, any § 349 claim is time-barred.[7]

Even if the Court considered the merits of the § 349 claim, it would fail because the complaint does not allege consumer-oriented conduct. "Generally, to state a claim for violation of Section 349, a plaintiff must allege facts showing 'first, that the challenged act or practice was consumer-oriented.'" *Hayrioglu*, 794 F. Supp. 2d at 410 (quoting *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000)). "To satisfy this requirement in the context of a real estate transaction, courts have generally required that a plaintiff allege that the defendant affirmatively and publicly sought transactions with consumers." *Id.* (citations omitted). These cases have addressed "a broad scheme involving affirmative efforts to mislead home purchasers about the condition of the homes being sold, the terms of their loans, or the lenders' interests." *Id.* at 412. Here, plaintiffs make no allegations about Countrywide's broader practices, nor that Countrywide sought out transactions like the CEMA among the public—in fact, plaintiffs sought out Countrywide because they could not obtain a loan elsewhere, and they wanted one quickly. Thus, plaintiffs allegations describe a "[p]rivate contract dispute[], unique to the parties, [which do] not fall within the ambit of the statute." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N. A.*, 85 N.Y.2d 20, 25 (1995).

## E.  Other Statutory Causes of Action

Other than the New York quiet-title statute (discussed *infra*), plaintiffs did not specify any statutes giving rise to their causes of action. Defendants have nonetheless argued that the complaint does not state claims under the federal Truth in Lending Act (TILA). In their opposition brief, plaintiffs did not address TILA, but wrote that the complaint contains "recognizable pleadings regarding NYS common law and Statutes." (Pl. Mem. at 12.) Therefore, the Court concludes that

---

[7] Plaintiffs do not address the statute of limitations in their brief in opposition to this motion, but they argue throughout that they did not discover Countrywide's fraud until February 9, 2011, when they found the MERS printout which designates Fannie Mae as the "investor" on the 2004 note. Construing plaintiffs' brief liberally, the Court reads that argument as a request for equitable tolling based on Countrywide's concealment of any fraud, which is available for § 349 claims. *See M & T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405, 411 (E.D.N.Y. 2004). However, "[c]oncealment of the cause of action can be accomplished either by defendant's contrivance to commit a wrong in such a manner as to conceal the very existence of a cause of action, or by actively misleading the plaintiff into the belief that he had no cause of action." *Rodriguez v. Vill. of Island Park, Inc.*, No. 89-CV-2676, 1991 WL 128568, at *9 (E.D.N.Y. July 2, 1991). Plaintiffs' allegation that they discovered fraud in 2011, based on the MERS printout, does not suggest that Countrywide contrived to commit a wrong and conceal a cause of action, or mislead plaintiffs concerning one. As discussed *supra*, the fact that Fannie Mae was listed as "investor" three years after the CEMA does not suffice as an allegation of fraud.

plaintiffs did not intend to assert any federal claims, to include a TILA claim; in any event, a TILA claim would be time-barred. *See Cardiello v. The Money Store*, 29 F. App'x 780, 781 (2d Cir. 2002) (recognizing that claims for damages under TILA are subject to one-year statute of limitations (citing 15 U.S.C. § 1640(e)); *Johnson v. Scala*, No. 05–CV–5529, 2007 WL 2852758, at *3 (S.D.N.Y. Oct. 1, 2007) ("Case law supports the notion that the statute of limitations for TILA claims does not start running upon the discovery of the non-disclosure, but, rather, upon the funding of the loan."); *Gorbaty v. Wells Fargo Bank, N.A.*, Nos. 10-CV-3291, 10-CV-3354 (NGG)(SMG), 2012 WL 1372260, at *14 (E.D.N.Y. Apr.18, 2012) (noting, where complaint described "an abusive and predatory home mortgage loan," that TILA amendment specifically addressing high-rate mortgages does not apply to residential mortgage transactions).

With respect to other possible statutory claims, defendants note that the term "predatory lending" is used throughout the complaint, but argue that plaintiffs have not stated a claim under any state predatory lending statute. The Court agrees. Viewing the complaint as a whole, and construing it liberally, the term "predatory lending" does not describe a separate claim, but is instead used within the complaint's core assertions of fraud and deceptive practices. The Court concludes that the complaint lacks allegations that would state a separate claim for predatory lending.[8] *Cf. Hayrioglu*, 794

F. Supp. 2d at 412 (discussing the distinct facts of four predatory lending cases brought under § 349); *accord Sutherland v. Remax 2000*, 872 N.Y.S.2d 693 (N.Y. Sup. Ct. 2008) ("[A] claim for predatory lending must be dismissed where the allegations are nothing more than a rehash of [the] fraud allegations and where the plaintiff is well aware of her own financial circumstances at the time she entered into [an] agreement." (internal quotation marks and citation omitted)); *Marzan v. Bank of Am.*, 779 F. Supp. 2d 1140, 1156 (D. Haw. 2011) (noting that "[t]he ambiguous term 'predatory lending' potentially encompasses a wide variety of types of alleged wrongdoing" and collecting cases indicating that "there is no common law claim for 'predatory lending'").[9]

## F.  Common Law

The complaint makes frequent use of common-law terminology, some of which consists of defenses that plaintiffs attempt to

---

[8] To the extent that the complaint addresses the terms of the consolidated 2008 mortgage and suggests that they were unfair or deceptive, those allegations do not state a claim for relief that is distinct from the § 349 or fraud claims. The complaint frames these allegations as examples of Countrywide's unconscionable conduct, which, the Court has noted, would be a defense in a foreclosure action but is not an affirmative claim for relief. The Court also notes

that the New York Legislature's response to the subprime foreclosure crisis, which included several new statutory provisions, appears to have focused on the defense of foreclosure actions, and those new provisions became effective after the execution of the CEMA in this case. *See generally Wells Fargo Bank, N.A. v. Meyers*, 966 N.Y.S.2d 108, 109-10 (N.Y. App. Div. 2013).

[9] Defendants also argue that plaintiffs did not state a claim under the Real Estate Settlement Procedures Act ("RESPA"). As noted above, it appears that plaintiffs did not intend to state any federal claims. Nonetheless, the Court agrees that the complaint does not allege a violation of RESPA. That statute "was enacted . . . to bring about a reduction in settlement costs. . . . RESPA prohibits, among other things, the charging of unearned fees for settlement services, the collection of excess escrow monies, and inaccurate escrow account reporting, and the imposition of fees for statements required by RESPA and TILA." *McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 588 (E.D.N.Y. 2010) (citing 12 U.S.C. § 2601, *et seq.*). There are no allegations concerning settlement services, escrow funds, or the imposition of fees.

convert into affirmative claims for relief. Therefore, to the extent that the complaint alleges causes of action based on unclean hands,[10] duress, and unconscionability, those claims are dismissed. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945) (explaining that the unclean hands defense "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant"); *Dunlop-McCullen v. Local 1S AFL-CIO-CLC*, 149 F.3d 85, 92-93 (2d Cir. 1998) (noting that defendants' unclean hands are relevant to the equitable balance, but when the doctrine is asserted as a defense); *220V Elec. Dealer Supply, Inc. v. Rondat, Inc.*, 443 N.Y.S.2d 632, 633 (N.Y. Sup. Ct. 1981) (holding that equitable defenses such as duress are not bases for affirmative relief); *Ng v. HSBC Mortgage Corp.*, No. 07-CV-5434(RRM)(VVP), 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011) ("Under New York law, unconscionability is an affirmative defense to the enforcement of a contract. . . . A cause of action for unconscionability may not be used to seek affirmative relief.").

Plaintiffs' claim that defendants breached the duty of good faith and fair dealing fails because the allegations relate solely to the formation of the CEMA. (Compl ¶ 35.) "New York law does not recognize a duty of good faith in the formation of a contract. . . . A good faith duty only exists in a party's performance or enforcement of a contract." *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 653 (E.D.N.Y. 2012). There is no allegation that defendants performed or enforced the CEMA in breach of any duty, and thus the claim alleging a breach of the duty of good faith and fair dealing is dismissed.

## G.  Quiet Title

The one statutory provision cited in the complaint is the New York Real Property Actions and Proceedings Law ("RPAPL") Article 15, which establishes a "quiet title" action under New York law. Although the term "quiet title" was used in common law, the statutory cause of action does not use that term. It exists "to compel the determination of any claim adverse to that of the plaintiff which the defendant makes." N.Y.R.P.A.P.L. §1501(1). The Second Circuit has explained this important distinction between the common-law and statutory causes of action:

> New York has codified the common law action to quiet title and statutorily redefined the necessary elements for a well-pleaded remaining cloud on title complaint. Under Article 15 of the Real Property Actions and Proceeding Law, the plaintiff need only plead its claim to an estate or interest in land and defendant's adverse claim; plaintiff need not plead the "invalidity" of defendant's claim as required under the common law.

*W. 14th St. Comm. Corp. v. 5 W. 14th Owners Corp.*, 815 F.2d 188, 196 (2d Cir. 1987).

The absence of a requirement that a plaintiff asserting a statutory quiet title claim

---

[10] Defendants have argued that plaintiffs' claims for equitable relief are barred by the unclean hands doctrine, but defendants have not shown how they were injured by plaintiffs' conduct. *Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 68-69 (E.D.N.Y. 2010).

plead "invalidity" is especially significant in this case, where plaintiffs have not plausibly claimed that defendants' mortgage interest in invalid, but where the complaint sufficiently alleges the statutory elements described in RPAPL § 1515. Under that section, an Article 15 claim must include allegations concerning: (1) the plaintiff's interest in the real property, and the particular nature of the interest; (2) that the defendant claims an interest in the property adverse to that of the plaintiff, and the particular nature of the interest; (3) whether any defendant is known or unknown, or incompetent; and (4) whether all interested parties are named. N.Y.R.P.A.P.L. § 1515; *see also Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 419 (S.D.N.Y. 2010).

Here, the complaint sufficiently alleges all four elements. The third and fourth elements do not appear to be disputed, and plaintiffs have adequately alleged that they are the deeded owners of the property, and that defendants claim to have an interest in the property. (Compl. ¶¶ 1-3.) Although the complaint does not sufficiently allege that defendants' interest was invalidated by fraud or the other alleged wrongdoing, the statutory quiet-title claim does not require that plaintiffs plead anything other than that defendants have an interest. As noted above, the stated purpose of the statutory cause of action is to determine "any" claim against plaintiff's interest. N.Y.R.P.A.P.L. § 1501(1): *W. 14th St. Comm. Corp.*, 815 F.2d at 196. Moreover, "[t]he fact that plaintiff executed the mortgage which he now seeks to remove as a cloud on title does not deprive him of the right to maintain the action." *Greenberg v. Schwartz*, 76 N.Y.S.2d 95 (N.Y. App. Div. 1948); *see also Barberan*, 706 F. Supp. 2d at 420 ("However weak Defendants believe Plaintiffs' factual claims regarding the enforceability of the mortgage, the note, and

the assignment to be, the Court will not decide which Party's claims are stronger on a motion to dismiss.").

For these reasons, the motion to dismiss is denied with respect to plaintiffs' claim under RPAPL Article 15.

## H.  Leave to Amend

Leave to amend should be freely granted when justice so requires. Fed. R. Civ. P. 15(a)(2). "This relaxed standard applies with particular force to *pro se* litigants." *Pangburn v. Culbertson*, 200 F.3d 65, 70 (2d Cir. 1999). The Second Circuit has emphasized that because "[a] pro se complaint is to be read liberally," courts "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation marks and citations omitted). Nonetheless, "[a] district court has discretion to deny leave for good reason, including futility." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Leave to amend is futile if the amended complaint is meritless and would fail to state a claim. *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009); *see also Ashmore v. Prus*, 510 F. App'x 47, 49 (2d Cir. 2013) (holding that denial of leave to amend was proper where barriers to relief for *pro se* plaintiff "cannot be surmounted by reframing the complaint").

Here, amending the complaint to re-plead the dismissed claims would futile. The first fraud theory is premised on an inaccurate view of the law, and thus cannot be repaired through amendment. The second fraud theory fails because of

admissions contained in the complaint itself, and any amendment would necessarily conflict with those admissions. The § 349 claim and any possible TILA claim are time-barred, and plaintiffs have not shown any circumstance warranting equitable tolling. They knew of the falsity of the income data when they executed the CEMA in 2008, and the only new information they claim to have discovered relates to the MERS printout from 2011, which does not address the legal questions about the mortgages and notes when the CEMA was executed. *See supra* note 7 (construing this allegation as an application for equitable tolling); *accord Rudaj v. Treanor*, 522 F. App'x 76, 77-78 (2d Cir. 2013) (affirming denial of leave to amend where *pro se* plaintiff claimed entitlement to equitable tolling based on his *pro se* status and misunderstanding of the law). Plaintiffs also have not indicated that they are aware of additional facts which would allow them to state a plausible § 349 or TILA cause of action. *See Cuoco*, 222 F.3d at 112 ("Cuoco, speaking through counsel on appeal, has suggested no new material she wishes to plead. The problem with Cuoco's causes of action is substantive; better pleading will not cure it."). Finally, the remaining common law theories do not state affirmative claims for relief, and could not be converted into such claims.

Therefore, leave to amend the complaint is denied.

## IV. CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part. The complaint's core assertions of fraud are dismissed because the alleged splitting of the 2004 mortgage and note does not invalidate the 2004 note or the CEMA, and because plaintiffs could not reasonably have relied on income data that they knew to be false (as conceded in the complaint). The latter fraud claim is also barred by the doctrine of *in pari delicto*. The remaining statutory claims, except for the claim under RPAPL 15, are time-barred and in any event fail to allege sufficient facts to support a plausible claim. The purported common-law claims are not cognizable as affirmative claims for relief. Leave to amend the fraud, statutory, and purported common-law claims would be futile and is denied. However, plaintiffs' quiet title cause of action under RPAPL Article 15 does state a claim, and the motion to dismiss is denied with respect to that claim only. As discussed *supra* at note 2, plaintiffs' motion to remand is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 12, 2014
        Central Islip, NY

* * *

Plaintiffs are *pro se*. Defendants are represented by Jason W. Creech, Houser & Allison, APC, 60 East 42nd Street, Suite 118, New York, NY 10165.